**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

    vs.                          Cr. No. 20-1848 KWR/KK

ESTEBAN GALLARDO,

        Defendant.

**ORDER ADOPTING MAGISTRATE JUDGE'S
PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

THIS MATTER is before the Court on Defendant Esteban Gallardo's Motion to Suppress (Doc. 29) ("Motion"), filed February 8, 2021. In his Motion, Defendant asks the Court to suppress "all evidence seized from his backpack on September 9, 2020" and "all fruits thereof." (*Id.* at 1.) The Government filed a response in opposition to the Motion on February 22, 2021, and Defendant timely filed a reply in support of it on March 15, 2021. (Docs. 31, 34, 35.)

Pursuant to an Order of Reference (Doc. 36), United States Magistrate Judge Kirtan Khalsa held an evidentiary hearing on the Motion on May 28, 2021 and, on June 3, 2021, issued her Proposed Findings and Recommended Disposition ("PFRD") recommending that the Motion be denied. (Docs. 42, 43, 46.) Defendant timely filed Objections to the Magistrate Judge's Proposed Findings and Recommended Disposition ("Objections") on July 15, 2021. (Docs. 50, 51.) Having considered *de novo* the parties' submissions, the evidence presented, the PFRD, the record, and the relevant law, and being otherwise fully advised, the Court FINDS that Defendant's Objections should be OVERRULED, the Magistrate Judge's PFRD should be ADOPTED, and Defendant's Motion should be DENIED.

# I. __Standard of Review__

Federal district judges may refer motions to suppress evidence in criminal cases to a magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). "Within 14 days after being served with a copy" of the magistrate judge's proposed findings and recommendations, "any party may serve and file written objections to such proposed findings and recommendations." 28 U.S.C. § 636(b)(1). The district judge

> shall make a de novo determination of those portions of the . . . proposed findings or recommendations to which objection is made. [The district judge] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The [district] judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*Id.* "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Further, "[i]n this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived." *United States v. Garfinkle*, 261 F.3d 1030, 1031 (10th Cir. 2001); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996).

Where a party files timely and specific objections to the magistrate judge's recommendation on a "dispositive" motion such as a motion to suppress, "the statute calls for a *de novo* determination, not a *de novo* hearing." *United States v. Raddatz*, 447 U.S. 667, 674 (1980). A *de novo* determination pursuant to 28 U.S.C. § 636(b) "requires the district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation." *In re Griego*, 64 F.3d 580, 584 (10th Cir. 1995). Although a district court must make a *de novo* determination of objections under 28 U.S.C. § 636(b)(1), the district court is not precluded from relying on the magistrate judge's proposed findings and recommendations. *See Raddatz*, 447 U.S. at 676 ("[I]n providing for a 'de novo determination' rather than *de novo* hearing, Congress

intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations.") (quoting 28 U.S.C. § 636(b)).

## II.  Factual Findings

On September 9, 2020, Albuquerque Police Department Officer Mario Perez noticed a silver four-door Toyota sedan in the parking lot of the Motel 6 on University Boulevard near Interstate 40 in Albuquerque, New Mexico. (Doc. 46 at 7-8, 59-60, 95.) A man later identified as Defendant Esteban Gallardo got into the sedan and drove out of the parking lot. (*Id.* at 7-8, 12, 18.) As he did so, Officer Perez "ran" the vehicle's license plate and learned it had been reported stolen. (*Id.* at 7-8, 18.) Sharing this information with other officers by radio, he learned from Albuquerque Police Department Detective Daniel Yurcisin that the registered owner, Amanda Casaus, had reported Defendant had refused to return the vehicle to her after she loaned it to him. (*Id.* at 9-10, 18-19, 28-29, 96, 98.) Officer Perez called Ms. Casaus to confirm the vehicle was still stolen. (*Id.* at 9-11.) She did not answer but called him back "almost immediately" and told him she had gotten the vehicle back. (*Id.* at 9-11, 17.)

Meanwhile, Defendant drove to "a few different locations," including a gas station, while Officer Perez followed him in an unmarked vehicle. (*Id.* at 12-13.) At Interstate 40 and University Boulevard, Albuquerque Police Department Detective Rachel Nakamura also started following Defendant, in a marked police unit. (*Id.* at 59, 72.) Officer Perez was on the phone with Ms. Casaus, and Detective Nakamura was aiming a green laser at the back of the silver Toyota to shoot a tracking device onto it, when Defendant returned to the Motel 6 parking lot. (*Id.* at 12, 57-61.)

By this time, Officer Perez had learned there was an active felony warrant for Defendant's arrest. (*Id.* at 12-13, 18-20.) This information and Defendant's photograph were relayed by radio

3

to all of the law enforcement officers involved in investigating the silver Toyota. (*Id.* at 29-30.) As this point, the officers' "plan moving forward" transitioned from investigating a reported auto theft to conducting surveillance to determine whether the man driving the vehicle was Defendant and, if so, executing the felony warrant for his arrest. (*Id.* at 13, 19, 30.)

At the Motel 6, Officer Perez saw a woman later identified as Ms. Casaus get into the silver Toyota with Defendant. (Doc. 40, Exs. 1, 4; Doc. 46 at 10-12, 96.) Defendant and Ms. Casaus then left the motel and drove south on University Boulevard before turning into the parking lot of an office building. (Doc. 46 at 13-14.) At the May 28, 2021 evidentiary hearing, Detectives Yurcisin and Nakamura testified that the office building in question was occupied by Camp Fire New Mexico. (*Id.* at 37, 42-45, 74; Def.'s Exs. B, C.) The Court takes judicial notice that the Camp Fire New Mexico building is located at 1613 University Boulevard, Northeast. *See* https://www.campfireabq.org/contact-us/ (last visited Jul. 27, 2021). However, on September 9, 2020, Detective Yurcisin called out that the building was located at 1609 University Boulevard, Northeast.[1] (Doc. 40, Ex. 1; Doc. 46 at 42-43.)

Detective Yurcisin saw the silver Toyota pull into Camp Fire New Mexico's parking lot and park on the south side of the building. (Doc. 46 at 40-45; Def.'s Exs. B, C.) There were "some other vehicles" in the parking lot but it was "fairly vacant." (*Id.* at 31, 46.) In an unmarked vehicle, Detective Yurcisin drove to a parking lot "just south of" the lot in which the silver Toyota had parked. (*Id.* at 28, 31, 41-42, 45.) From there, nothing blocked him from seeing the vehicle and anyone who exited it. (*Id.* at 31.) As Detective Yurcisin watched, Defendant and Ms. Casaus got out and "switched seats," so that Ms. Casaus was in the driver's seat and Defendant was in the

---

[1] New Mexico Donor Services occupies the building at 1609 University Boulevard, Northeast. (Def.'s Ex. B); *see also* https://donatelifenm.org/home/contact-us/ (last visited Jul. 27, 2021). The New Mexico Donor Services building is located directly behind and to the west of the Camp Fire New Mexico building. (Def.'s Ex. B.)

front passenger seat. (*Id.* at 31-32, 46-47.) He then saw Defendant exit the vehicle with a dog, which Defendant walked to a "little dirt area" west of the building. (*Id.* at 32, 47.) At this point, Detective Yurcisin "was able to clearly observe [Defendant's] build, height, weight, his face, and positively identify that it was going to be [Defendant]," except that he had "a little tattoo above his right eyebrow" that was not present in his latest booking photograph. (*Id.* at 32; Doc. 40, Ex. 1.) Defendant then returned to the vehicle, let the dog into the back seat, and sat back down in the front passenger seat. (Doc. 46 at 34, 47.)

As Detective Yurcisin continued to watch, Defendant exited the vehicle once more and threw a light gray backpack with black trim "in a bush that was right in front of their car, right next to the building." (Doc. 40, Ex. 2; Doc. 46 at 35, 48, 86.) Asked to describe Defendant's "motion," Detective Yurcisin testified that Defendant "tossed the backpack into like a large green bush. . . . It wasn't like it was placed or carefully put anywhere. It was discarded, like he ditched it. Like I would throw something away."[2] (Doc. 46 at 37-38.) By radio, Detective Yurcisin relayed that Defendant had "just ditched the backpack into these bushes." (*Id.* at 35, 48, 65, 77; Doc. 40, Ex. 1.) "[I]mmediately" after Defendant threw the backpack in the bush, he got back into the silver Toyota's passenger seat, and he and Ms. Casaus drove out of the parking lot. (Doc. 46 at 35, 38-39.) From there, they drove to the Circle K at the intersection of University Boulevard and Indian School Road, Northeast.[3] (*Id.* at 15, 23, 68, 74.)

---

[2] In his Objections, Defendant argues that he "intentionally placed the backpack within the bushes." (Doc. 51 at 6.) However, the portions of the evidentiary hearing transcript to which he cites do not support this assertion, (*see id.* (citing Doc. 46 at 32:7-13, 35:5-8)); and, the Court has located no other record evidence that would do so. The Court therefore rejects this argument.

[3] The Court takes judicial notice that Indian School Road, Northeast, becomes Odelia Road, Northeast, at that intersection. (*See* Doc. 42 at 4 & n.1.)

Detective Nakamura arrived at the Camp Fire New Mexico building "pretty quick[ly]" after Defendant and Ms. Casaus had left it. (*Id.* at 66, 74, 90; Def.'s Exs. B, C.) It was midday on a weekday,[4] and there was a steady flow of traffic driving by on University Boulevard. (Doc. 40, Ex. 2; Doc. 46 at 86, 88.) Detective Nakamura remembered seeing "some" cars in the parking lot but did not remember seeing any people. (Doc. 46 at 77-79.) Defendant and Ms. Casaus had left the premises and were not in sight. (*Id.* at 66, 90.) Detective Yurcisin directed her to "which bush in the general area to look at," and she saw the backpack sitting "literally right on top of it."[5] (*Id.* at 39, 48, 65-66, 80, 85.) The bush was "a little lower than [her] chest," and the backpack was visible from where she was standing in the parking lot; she saw it before she grabbed it.[6] (*Id.* at 85, 89, 91-92.) Nothing and no one restricted Detective Nakamura's access to the backpack. (Doc. 40, Ex. 2; Doc. 46 at 66-67, 77-78, 90.)

About twenty (20) seconds after she parked and exited her vehicle, Detective Nakamura seized the backpack, set it on the pavement, and opened it. (Doc. 40, Ex. 2; Doc. 46 at 66-67.) It was not locked or zipped closed. (Doc. 40, Ex. 2; Doc. 46 at 87-88.) Detective Nakamura opened the backpack at that time because she had heard Detective Yurcisin report that Defendant had ditched it so she "treated it as abandoned property." (Doc. 46 at 67.) She did not speak to Defendant before she opened it. (Doc. 40, Ex. 2.) Detective Nakamura carried the backpack back to her

---

[4] The Court takes judicial notice that September 9, 2020 fell on a Wednesday.

[5] In his Objections, Defendant argues that the backpack was "fully concealed so that it could not be seen by any passers-by." (Doc. 51 at 6; *see also id.* at 7 (arguing that Defendant took "precautions to ensure that [the backpack] was fully concealed").) Again, however, the portions of the evidentiary hearing transcript to which he cites do not support this assertion, (*see id.* (citing Doc. 46 at 32:7-13, 35:5-8)); and, the Court has located no other record evidence that would do so. Based on the uncontroverted record evidence to the contrary, the Court rejects Defendant's argument that the backpack was "fully concealed," or indeed concealed at all.

[6] At the evidentiary hearing, Detective Nakamura testified that she "wouldn't have found [the backpack] without Officer Yurcisin." (Doc. 46 at 82.) She later explained that she meant she "wouldn't have known which bush in the general area to look at, it if wasn't for [Detective Yurcisin]," because she "didn't see the backpack being discarded." (*Id.* at 85.)

vehicle, opened it again, and reached inside it briefly. (*Id.*; Doc. 46 at 67.) Seeing a gun inside, she radioed to other officers, "the backpack's got a gun, so 48," meaning "use caution." (Doc. 40, Ex. 2; Doc. 46 at 68.) She then drove to the Circle K at University Boulevard and Indian School Road. (*Id.* at 68.)

At the Circle K, a male officer[7] approached the silver Toyota while it was parked by a gas pump and spoke to Defendant and Ms. Casaus. (Doc. 40, Ex. 1.) Defendant gave the officer his name. (*Id.*) Ms. Casaus gave the officer her driver's license and said she was the car's registered owner, she had tried to report it was no longer stolen, and a police officer had "just called" her about it. (*Id.*) Returning to his vehicle, the male officer told other officers at the Circle K, including Detective Nakamura, that the tattoo above Defendant's eyebrow was "fresh." (*Id.*) While emptying the backpack at the scene, Detective Nakamura found two loaded guns inside, and the male officer determined that one of them had been reported stolen. (*Id.*; Doc. 46 at 69-71.)

Officers including Officer Perez arrested Defendant on his felony warrant and patted him down, finding what appeared to be controlled substances on his person. (Doc. 46 at 15.) When Detective Nakamura searched the backpack more thoroughly after Defendant's arrest, she found a gallon-sized bag of a crystal-like substance she believed to be methamphetamine, as well as other items that appeared to be controlled substances and drug paraphernalia. (*Id.* at 69-70.) In its response to Defendant's Motion, the Government alleged that the backpack was ultimately found to contain 113 gross grams of a white crystal substance that field tested positive for methamphetamine, 31 blue pills that resembled counterfeit oxycodone pills containing fentanyl,

---

[7] The Government indicates that this officer was Brandon Forsberg; however, there is no evidence in the record to confirm the officer's name. (*See* Doc. 31 at 4-5; Doc. 40 at 1.) He did identify himself when he first spoke to Defendant and Ms. Casaus, but his name is unintelligible on the video of this encounter. (Doc. 40, Ex. 1.)

and two functional handguns.[8] (Doc. 31 at 7.) There is no evidence in the record that any law enforcement officer ever obtained a warrant to search or seize the backpack.

New Mexico State Police Officer Jerry Santana interviewed Ms. Casaus and Defendant at the Circle K. (Doc. 40, Exs. 4, 5.) After Officer Santana admonished her to be honest, Ms. Casaus stated Defendant "threw" his backpack in a bush. (Doc. 40, Ex. 4.) When Officer Santana asked her if Defendant had known officers were following him, Ms. Casaus responded that Defendant went to get coffee and when he came back she saw an officer "go through" the Motel 6 and got worried because Defendant had warrants. (*Id.*) After telling Officer Santana about how she had reported her car stolen and got it back, she added, "he thought maybe because of the car or whatever that they were following him and then that cop called me so I was honest about it, like, he did call me and ask me something so something's going on." (*Id.*)

Before interviewing Defendant, Officer Santana read him his *Miranda* rights from a card and asked if he understood them. (Doc. 40, Ex. 5.) Defendant nodded in response. (*Id.*) Officer Santana asked why he "dump[ed]" the backpack, and Defendant answered, "[j]ust to get rid of it." (*Id.*; Doc. 46 at 99.) During his interview with Officer Santana, Defendant admitted there were two loaded guns in the backpack, he sold methamphetamine, and he was a convicted felon not allowed to possess firearms or ammunition. (Doc. 40, Ex. 5; Doc. 46 at 100.)

### III.  Procedural History

On September 25, 2020, Defendant was charged by criminal complaint with possession of a firearm in furtherance of a drug trafficking crime, possession of methamphetamine and fentanyl with intent to distribute, and being a felon in possession of a firearm, on or about September 9, 2020. (Doc. 1 at 1.) The Court appointed counsel to represent him following his initial appearance

---

[8] However, the Government has not yet presented any evidence to support these allegations, and the Court considers them solely for the purpose of identifying the potential evidence Defendant seeks to suppress.

on October 1, 2020, (Docs. 6, 8), and held a preliminary hearing on October 5, 2020, at which it dismissed the fentanyl charge. (Doc. 12; Doc. 27 at 38.) Following a detention hearing on October 7, 2020, the Court ordered Defendant detained pending trial. (Docs. 15, 17.) On October 14, 2020, the Grand Jury issued a two-count indictment charging Defendant with possessing with intent to distribute 50 grams and more of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and using and carrying a firearm during and in relation to a drug trafficking crime and possessing a firearm in furtherance of such crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Doc. 19.) Defendant entered a plea of not guilty at his arraignment on October 21, 2020. (Doc. 21.) Trial was originally set for December 14, 2020 and has been continued six times. (Docs. 24-26, 28, 32, 39, 48.) It is currently set for September 13, 2021. (Doc. 48 at 2.)

Defendant filed his Motion to Suppress on February 8, 2021. (Doc. 29.) The Government filed a response in opposition to the Motion on February 22, 2021, and Defendant filed a reply in support of it on March 15, 2021. (Docs. 31, 35.) By an Order of Reference dated May 4, 2021, the Court referred Defendant's Motion to Magistrate Judge Khalsa to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the Motion. (Doc. 36.) On May 26, 2021, the Government filed its Exhibit 3 and lodged its Exhibits 1, 2, 4, and 5 with the Court. (Docs. 40, 41.) The Magistrate Judge held an in-person evidentiary hearing on the Motion on May 28, 2021. (Doc. 46.) At the hearing, Officer Perez, Detective Yurcisin, Detective Nakamura, and Officer Santana testified; the Government's exhibits were admitted without objection; and, four maps of the relevant area were admitted as Defendant's Exhibits A, B, C, and C-2. (*Id.* at 2-5.) On June 3, 2021, the Magistrate Judge issued her PFRD recommending that the Motion be denied. (Doc. 42.) Defendant timely filed his Objections on July 15, 2021. (Docs. 50, 51.)

## IV. <u>Analysis</u>

In his Motion, Defendant asks the Court to suppress all of the evidence officers seized from his backpack on September 9, 2020, "as well as all fruits thereof, including the testimony and reports of police officers or other law enforcement agents regarding the evidence seized therefrom." (Doc. 29 at 1, 8.) In support of his request, Defendant argues that Detective Nakamura's seizure and search of the backpack violated the Fourth Amendment, because she did not have a warrant or consent to seize or search it, and no exception to the warrant requirement applied. (*See generally id.*) Though he acknowledges that "[t]he Fourth Amendment is not implicated" when police search abandoned property, Defendant argues that he did not abandon the backpack, and thus, the warrantless seizure and search of it were unconstitutional. (*Id.* at 4-7.)

In its response, the Government first asserts that the Court should deny Defendant's Motion because he did in fact abandon the backpack before Detective Nakamura seized and searched it. (Doc. 31 at 7-14.) The Government also argues that the seizure and search were constitutional because even if Defendant did not abandon the backpack, Detective Nakamura acted in good faith and reasonably believed he had. (*Id.* at 14-17.) Finally, the Government contends that the seizure and search were proper because officers would have inevitably discovered the evidence in the backpack during a lawful search incident to arrest or an inventory search following Defendant's arrest. (*Id.* at 17-18.)

In his reply, Defendant counters that the Government cannot meet its burden of showing abandonment by a preponderance of the evidence. (Doc. 35 at 2-5.) Defendant also argues that the good-faith exception to the Fourth Amendment's warrant requirement does not apply here. (*Id.* at 5-6.) Finally, Defendant points out that officers would not inevitably have discovered the contents of his backpack during a search incident to his arrest because they searched it before he was

arrested and he did not have the backpack with him at the time. (*Id.* at 6-7.) In addition, Defendant argues that the backpack's contents would not inevitably have been discovered had the backpack remained in the silver Toyota at the time of his arrest, pursuant to either a search incident to arrest or an inventory search. (*Id.* at 7-8.)

In her PFRD, the Magistrate Judge proposed to find that Detective Nakamura's seizure and search of Defendant's backpack were constitutional because Defendant voluntarily abandoned it. (Doc. 42 at 8-16.) More particularly, she proposed to find that

> the Government has shown by a preponderance of the evidence that Defendant voluntarily abandoned his backpack when he threw it into the bushes at 1613 University Boulevard, Northeast and then got into a car and rode away, leaving the backpack behind.

(*Id.* at 13.) In proposing this finding, the Magistrate Judge particularly noted the following:

> Defendant discarded the backpack during regular business hours in a parking lot fully accessible to the public, on a busy street in the middle of a populous city. His actions were visible to persons driving, walking, and parked in the vicinity (including Detective Yurcisin), and the backpack was visible to persons standing beside the bushes where he left it (including Detective Nakamura). Defendant had no association with or control over the premises where he left the backpack; he left no one behind to watch over it; and, it was not locked or secured in any way. The bushes were its sole protection from inquisitive (and acquisitive) passers-by, and they were scant protection indeed given that the backpack was sitting on top of them. Although Defendant probably hoped to come back for the backpack later, any expectation that it would remain undisturbed where he left it was objectively unreasonable. In these circumstances, Defendant lacked any objectively reasonable expectation of privacy in the backpack that society will recognize.

(*Id.* (quotation marks, citations, and brackets omitted).) The Magistrate Judge therefore recommended denial of Defendant's Motion.[9] (*Id.* at 16.)

In his Objections, Defendant argues that, contrary to the Magistrate Judge's proposed findings, the Government did *not* meet its burden of establishing abandonment. (Doc. 51 at 2-3.)

---

[9] Because she recommended that the Court deny Defendant's Motion on the basis of abandonment, the Magistrate Judge did not consider the Government's other arguments in opposition to the Motion. (Doc. 42 at 16.)

He also argues that the cases on which the Magistrate Judge relied are "[r]eadily [d]istinguishable"

from this case. (*Id.* at 4-7.) The Court will consider each of these arguments in turn.

> **A.      The Government has shown by a preponderance of the evidence that Defendant abandoned his backpack before Detective Nakamura seized and searched it.**

The Fourth Amendment to the United States Constitution guarantees "the right of the

people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. As

such, "a warrant is generally required before an officer may search or seize persons or property,"

including containers. *United States v. Warwick*, 928 F.3d 939, 943 (10th Cir. 2019) (citing

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)); *see United States v. Donnes*, 947 F.2d

1430, 1435 (10th Cir. 1991) ("[A]bsent some special exception, all containers and packages will

receive the full protection of the [F]ourth [A]mendment during a police search."). Notably,

however, "[t]he warrant requirement is subject to a few specifically established and well-

delineated exceptions." *Warwick*, 928 F.3d at 943 (quotation marks omitted).

One exception to the warrant requirement is abandonment. "The Fourth Amendment

permits warrantless searches and seizures of abandoned property." *United States v. Sanchez*, 983

F.3d 1151, 1161 (10th Cir. 2020); *see also United States v. Juszczyk*, 844 F.3d 1213, 1213 (10th

Cir. 2017) ("The Fourth Amendment does not prohibit a search of property that has been

abandoned.") (quotation marks omitted); *United States v. Austin*, 66 F.3d 1115, 1118 (10th Cir.

1995) ("[A] warrantless search and seizure of abandoned property is not unreasonable under the

Fourth Amendment."). "When individuals voluntarily abandon property, they forfeit any

expectation of privacy in it they might have had."[10] *United States v. Trimble*, 986 F.2d 394, 399

(10th Cir. 1993); *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983).

---

[10] To satisfy this exception to the warrant requirement, "[t]he owner's abandonment must be voluntary, and abandonment cannot be voluntary when it results from a violation of the Fourth Amendment." *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018). Here, Defendant has never argued that his actions with respect to the backpack

The Tenth Circuit has stated that "the burden is on the government to establish abandonment *by a preponderance of the evidence*." *United States v. Quintana-Grijalva*, 332 F. App'x 487, 491 (10th Cir. 2009) (emphasis added) (citing *United States v. Denny*, 441 F.3d 1220, 1226 (10th Cir. 2006)). In his Objections, however, Defendant argues that the Government "must *clearly* show the abandonment," quoting *United States v. Calderon-Gonzales*, No. CR 12-1240 JP, 2013 WL 12330065, at *7 (D.N.M. June 27, 2013). (Doc. 51 at 2 (emphasis added).) The *Calderon-Gonzales* court cited to a single Sixth Circuit decision, *United States v. Robinson*, 430 F.2d 1141, 1143 (6th Cir. 1970), in support of this proposition. *Calderon-Gonzales*, 2013 WL 12330065 at *7. *Robinson*, in turn, relied on another Sixth Circuit decision, *Coleman v. Maxwell*, 387 F.2d 134, 135 (6th Cir. 1967), and two Eighth Circuit decisions, *Friedman v. United States*, 347 F.2d 697, 704 (8th Cir. 1965), and a decision in a civil replevin action, *i.e.*, *Linscomb v. Goodyear Tire & Rubber Co.*, 199 F.2d 431, 435 (8th Cir. 1952). *Robinson*, 430 F.2d at 1143. The Court has not located any Tenth Circuit decision requiring a "clear showing" of abandonment in the context of the Fourth Amendment. Thus, to the extent a clear showing differs from a showing by a preponderance of the evidence, the Court will require the latter in accordance with Tenth Circuit caselaw.[11]

Under Tenth Circuit law, "[a]bandonment occurs if either (1) the owner subjectively intended to relinquish ownership of the property or (2) the owner lacks an objectively reasonable expectation of privacy in the property." *United States v. Easley*, 911 F.3d 1074, 1083 (10th Cir. 2018). In other words, "[e]ven where a suspect does not subjectively intend to relinquish all

---

were involuntary or that a separate Fourth Amendment violation precipitated them; rather, he has consistently argued that his actions did not constitute abandonment. (*See generally* Docs. 29, 35, 46, 51.)

[11] Nevertheless, the Court also notes that any difference between the two standards is immaterial here, because the Government's showing would satisfy either of them.

ownership interest in an item, such suspect may nevertheless relinquish his or her reasonable expectation of privacy in the item." *Denny*, 441 F.3d at 1227. "Findings of subjective intent are findings of fact," while "a determination of whether the defendant retained an objectively reasonable expectation of privacy in the property that society will recognize is a question of law." *Id.* (quoting *United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997)).

Additionally, the Tenth Circuit has found property to be abandoned "where the defendant *either* (1) explicitly disclaimed an interest in the object, *or* (2) unambiguously engaged in physical conduct that constituted abandonment." *Denny*, 441 F.3d at 1227 n.6 (emphasis in original); *Garzon*, 119 F.3d at 1452 (emphasis added); *cf. United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016) ("We consider the dual factors of whether the defendant physically relinquished his property and whether he denied ownership of it. However, a verbal denial of ownership is not necessary for a finding of abandonment.") (citation omitted). With respect to "physical conduct," the Tenth Circuit has observed that

> [m]erely relinquishing physical control of an item is not the same as abandoning it. For example, in *Smith v. Ohio*, 494 U.S. 541, 543-44, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (per curiam), the Court held the defendant did not abandon his paper bag when he threw it on the hood of his car before speaking with police. Likewise, a passenger who lets a package drop to the floor of the taxicab in which he is riding can hardly be said to have abandoned it. *Rios v. United States*, 364 U.S. 253, 262 n.6, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960).

*Miller v. Bear*, 781 F. App'x 745, 752 (10th Cir. 2019) (brackets and quotation marks omitted).

Rather, when the Government has sought to show abandonment by a defendant's physical conduct, courts have focused on various factors relevant to whether the defendant, by his actions, objectively relinquished his right and ability to control access to the property. For example, "where a defendant places his property is relevant to the determination of whether society would recognize his or her expectation of privacy in the property as reasonable." *Denny*, 441 F.3d at 1229; *cf.*

*Nowak*, 825 F.3d at 949 ("Whether property is discarded in a public, private, or semi-private place is a factor in considering whether the property has been abandoned, but it is not dispositive."). Thus, the Tenth Circuit has found abandonment where, among other factors, the defendant's ability to recover his property from where he left it "depended entirely upon fate and the absence of inquisitive (and acquisitive) passers-by." *Jones*, 707 F.2d at 1172; *see also United States v. Morgan*, 936 F.2d 1561, 1571 (10th Cir. 1991) (noting that defendant's ability to recover bag, "if left where it was thrown," was "dependent upon fate" in finding abandonment). Courts have also considered whether the defendant left the property in someone else's care, and, if so, the defendant's relationship to that person. *See, e.g., Austin*, 66 F.3d at 1119 & n.2 (noting that defendant entrusted bag to "a stranger," "without any conditions or agreements," in finding abandonment); *Morgan*, 936 F.2d at 1570-71 (noting that defendant did not leave his property "to the care or responsibility of another" in finding abandonment); *see also Juszczyk*, 844 F.3d at 1214-15 (noting that defendant was "not close" to homeowner on whose roof he threw backpack in finding abandonment).

As the Magistrate Judge proposed to find in her PFRD, the Government in this case has clearly shown by a preponderance of the evidence that Defendant abandoned his backpack when he threw it in a bush next to an office building and then got into the silver Toyota and rode away. (Doc. 42 at 13.) Defendant objects that "[t]he facts known to [Detective] Nakamura" when she seized and searched the backpack were insufficient to establish abandonment. (Doc. 51 at 3.) According to Defendant, the "total sum" of these facts were:  (1) officers had been pursuing the silver Toyota, first because it had been reported stolen, and then because they believed Defendant was a passenger in it and there was a felony warrant for his arrest; and, (2) Detective Nakamura heard Detective Yurcisin state over the radio that Defendant had "ditched" the backpack. (*Id.*)

15

However, Defendant's argument flatly ignores many highly pertinent additional factors known to Detective Nakamura when she seized and searched the backpack, including that:  (1) Defendant "ditched" it on a weekday during regular business hours; (2) Defendant "ditched" it in a parking lot next to an office building; (3) the parking lot was accessible to the public; (4) the parking lot was next to a busy street in the middle of a populous city; (5) Defendant's actions were visible to Detective Yurcisin from his vantage point in an adjacent parking lot also accessible to the public; (6) Defendant left the backpack sitting on top of a chest-high bush planted between the office building and the parking lot; (7) Detective Nakamura could see the backpack from where she was standing before she grabbed it; (8) Defendant was not on the premises when she found it; (9) Defendant had left no one behind to watch over it; (10) it was not locked or secured in any way; and, (11) no one and nothing restricted her access to it. Collectively, these circumstances clearly and unambiguously establish that Defendant lacked any "objectively reasonable expectation of privacy in [the backpack] that society will recognize" when Detective Nakamura seized and searched it. *Denny*, 441 F.3d at 1227.

Defendant claims "it is highly unlikely that anyone would have located the backpack before [he] could retrieve it" had Detective Yurcisin not been watching him. (Doc. 51 at 7.) In support, Defendant cites to Detective Nakamura's testimony that she "could see" the backpack when she was standing "right on top of" the bush. (*Id.* (citing Doc. 46 at 86:14-19, 87:9-12).) However, Defendant was arrested on a felony warrant shortly after discarding the backpack. (Doc. 46 at 15, 100.) Thus, contrary to his assertion, it is quite likely that someone would have located the backpack—which, again, was sitting on top of a chest-high bush in a parking lot next to an office building on a busy urban street—before he could return to retrieve it. In this regard, the Court notes that Detective Nakamura seized the backpack about twenty (20) seconds after she parked and

16

exited her vehicle. Even taking into consideration that Detective Yurcisin directed her to "which bush in the general area to look at," (Doc. 46 at 85), her ability to find the backpack so quickly refutes Defendant's suggestion that no civilian was likely to find it before he could come back to get it.

In his Objections, Defendant argues that the Court should reject the Magistrate Judge's recommended disposition because "[t]he only information properly considered" in determining whether Defendant abandoned the backpack "is that which was actually known to the officers at the time of the search," but "it is unclear whether [the Magistrate Judge] relied on Ms. Casaus' [post-search] statements." (Doc. 51 at 3 & n.1.) Defendant's argument is unavailing for two reasons. First, the Magistrate Judge cited to no facts derived from Ms. Casaus' post-search statements to support her analysis.[12] (Doc. 42 at 13-14 & n.7.) Rather, she proposed to find abandonment "based on Defendant's unambiguous actions." (*Id.* at 14.) Second, the Court now definitively states that it is not relying on Defendant's or Ms. Casaus' statements or any other information officers learned after the seizure and search of Defendant's backpack in finding abandonment. For these reasons, the Court finds that the Government has shown by a preponderance of the evidence that Defendant voluntarily abandoned his backpack before Detective Nakamura seized and searched it.

### B.    *The cases cited in the Magistrate Judge's PFRD confirm that Defendant abandoned his backpack.*

Defendant next argues that the Court should reject the Magistrate Judge's recommended disposition because "[e]ach of the cases cited by the Magistrate Judge . . . [is] distinguishable from [Defendant's] case." (Doc. 51 at 4.) Unsurprisingly, Defendant is correct that none of the cases the

---

[12] In a footnote, the Magistrate Judge did point out that Ms. Casaus' statements to Officer Santana constituted record evidence that "Defendant believed police might be following him." (Doc. 42 at 15-16 n. 9.) However, she went on to state that "what Defendant believed or suspected" was "superfluous" to her analysis. (*Id.*)

Magistrate Judge cited are factually identical to this one. Nevertheless, the cases Defendant tries to distinguish are similar to this case in material respects and bolster the Court's conclusion that Defendant abandoned his backpack.

First, Defendant attempts to distinguish *Jones*, 707 F.2d at 1169, *Denny*, 441 F.3d at 1220, and *United States v. Witten*, 649 F. App'x 880 (11th Cir. 2016), on the basis that he, unlike the defendants in those cases, did not verbally disclaim an interest in his backpack before police seized and searched it.[13] (Doc. 51 at 4-5.) However, as previously discussed, the Government can show abandonment by *either* words *or* actions. *Denny*, 441 F.3d at 1227 n.6; *Garzon*, 119 F.3d at 1452. And though some courts, as in *Jones*, 707 F.2d at 1172-73, have found abandonment based on the defendant's words and actions together, many others have found abandonment based on actions alone. *See, e.g.*, *Sanchez*, 983 F.3d at 1161-62; *Juszczyk*, 844 F.3d at 1213-15; *United States v. Hayes*, 551 F.3d 138, 143, 149 (2d Cir. 2008); *United States v. Flynn*, 309 F.3d 736, 737-39 (10th Cir. 2002); *Morgan*, 936 F.2d at 1570-71; *Nowak*, 825 F.3d at 947-49; *United States v. Gaines*, 405 F. Supp. 3d 1039, 1048 (D. Kan. 2019). Likewise, here, the Government has shown abandonment based on Defendant's unambiguous actions.

Defendant also suggests that *Jones* is materially distinguishable because the defendant in that case left his satchel "outside of a building on public property in plain sight where it could be picked up by anyone who happened to pass by." (Doc. 51 at 5 (emphasis omitted) (citing *Jones*, 707 F.2d at 1172).) However, this aspect of *Jones* actually reinforces the Court's conclusion that Defendant abandoned his backpack. Similar to the defendant in *Jones*, Defendant in this case left his backpack in a parking lot by an office building, sitting on top of a chest-high bush, and thus

---

[13] After Detective Nakamura had already searched the backpack, Defendant told Officer Santana that he left the backpack where he did "to get rid of it," which indicates a subjective intent to abandon it. (Doc. 40, Ex. 5.) However, as already noted, the Court does not rely on any of Defendant's or Ms. Casaus' post-search statements.

"in plain sight where it could be picked up by anyone who happened to pass by," *e.g.*, while walking from the parking lot to the building or vice versa.

Defendant next argues that his case differs materially from *Juszczyk*, 844 F.3d at 1213, and *Austin*, 66 F.3d at 1115, because in those cases, the defendants "left [their property] with others who had no reason to safeguard or return it to them." (Doc. 51 at 5.) Again, however, this aspect of *Juszczyk* and *Austin* actually reinforces the Court's conclusion that Defendant abandoned his backpack. Here, Defendant left his backpack wholly unsupervised and thus at the disposal of literally anyone who happened upon it. And, of course, there is no reason to believe that a random stranger who found the backpack would have any "reason to safeguard or return it to [Defendant]." (*Id.*) Like *Juszczyk* and *Austin*, this case stands in stark contrast to *United States v. Basinski*, in which the Seventh Circuit found that the defendant did not abandon his "locked briefcase" when he "entrusted" it to "a life long friend" to hide in the friend's "locked barn, surrounded by a locked gate, in a remote part of Wisconsin." 226 F.3d 829, 836-38 (7th Cir. 2000).

Defendant next tries to distinguish this case from *Sanchez*, 983 F.3d at 1151, *Morgan*, 936 F.2d at 1561, *Flynn*, 309 F.3d at 736, and *Gaines*, 405 F. Supp. 3d at 1039, by arguing that the defendants in those cases discarded their property while "knowingly fleeing law enforcement in hot pursuit."[14] (Doc. 51 at 5-6.) However, whether Defendant knew officers were pursuing him when he discarded his backpack is superfluous to the Court's ruling.[15] Regardless of his subjective

---

[14] The Court disagrees that the defendant in *Flynn* could be fairly described as "knowingly fleeing law enforcement in hot pursuit" when his property was discarded. (Doc. 51 at 6.) In that case, the defendant's passenger "dropped a large sack" at the top of an exit ramp after the defendant exited the highway in response to signs falsely indicating a drug checkpoint ahead. 309 F.3d at 737-38. It does not appear that officers were even aware of the defendant, much less pursuing him, until he evaded the imaginary checkpoint and his passenger disposed of the sack. *Id.*

[15] The record does include evidence that Defendant believed police might be following him, most particularly Ms. Casaus' statement to Officer Santana that he thought maybe police were following him because of her car, which she had previously reported stolen. (Doc. 40, Ex. 4.) Again, however, the Court does not rely on this evidence because, though it concerns Defendant's state of mind before the challenged seizure and search, officers did not obtain it until afterward.

knowledge, motivation, or intent, Defendant lacked an objectively reasonable expectation of privacy in the backpack after he threw it in a bush wholly accessible to passersby and left it behind without taking any steps to secure it.

Defendant also tries to distinguish this case from *Hayes*, 551 F.3d at 138, the case the Magistrate Judge described as "[p]erhaps most similar to the present matter." (Doc. 42 at 12; Doc. 51 at 6.) In *Hayes*, the Second Circuit affirmed the district court's conclusion that the defendant abandoned his bag by throwing it "into the bushes at the edge of his property," without "locking it or taking other affirmative steps to protect it from passersby and animals." 551 F.3d at 143. "Although . . . the bag itself may have been naturally shielded from view by vegetation, the general area where the bag was found was visible from the street." *Id.* at 149 (brackets and quotation marks omitted). According to the Second Circuit, "because . . . there was no expectation of privacy associated with the non-curtilage area where the black bag was discovered, there was similarly no expectation of privacy as to the bag and its contents." *Id.*

Defendant argues that *Hayes* is distinguishable because in that case the defendant's bag was searched "as a result of a narcotic dog's alert," whereas here, officers had no idea what was in Defendant's backpack.[16] (Doc. 51 at 6.) However, this distinction makes no difference to the pertinent inquiry in both cases, *i.e.*, whether "the owner subjectively intended to relinquish ownership of the property" or "lack[ed] an objectively reasonable expectation of privacy in [it]." *Easley*, 911 F.3d at 1083. And here, as in *Hayes*, Defendant lacked an objectively reasonable

---

[16] This description of the facts in *Hayes* is not quite accurate. In fact, the police narcotics dog in *Hayes* was playing frisbee with its handler in the defendant's front yard when it "stopped and pointed its nose in the air as if it were alerted to something," whereupon the handler encouraged the dog to continue investigating. 551 F.3d at 141. The dog then sniffed around the perimeter of the defendant's yard until it "dove into" the scrub brush at the edge of the property and returned to its handler with the defendant's bag in its mouth. *Id.* at 141-43. After the dog dropped the bag, the handler searched it. *Id.* at 142.

expectation of privacy in property he threw in a bush on "non-curtilage" property without taking any "affirmative steps to protect it from passersby and animals." 551 F.3d at 143, 149.

Finally, Defendant tries to distinguish his case from the cases the Magistrate Judge cited on the basis that he "concealed" his backpack, or at least made an effort to do so. (Doc 51 at 6-7.) However, *Juszczyk*, *Witten*, and *Hayes* show that efforts to conceal property do not necessarily preclude a finding of abandonment. In *Juszczyk*, the defendant tried to conceal his backpack on an acquaintance's roof. 844 F.3d at 1213-14. In *Witten*, the defendant tried to hide his backpack under another person's porch. 649 F. App'x at 885. In *Hayes*, the defendant's bag was likely "shielded from view by vegetation." 551 F.3d at 149. Nevertheless, in each of these cases, the court found that the defendant had abandoned the property at issue. *See also Denny*, 441 F.3d at 1226-28 (defendant abandoned plastic bag when he hid it underneath sleeper car seat and then disclaimed ownership and denied knowledge of it).

Nor does a defendant's hope that he might later return to retrieve his property preclude a finding of abandonment, where the defendant's words and/or actions show that any expectation of privacy is objectively unreasonable. *See, e.g., Austin*, 66 F.3d at 1118-19 (defendant did not retain "legitimate expectation of privacy" in bag he "clearly intended to return and retrieve"); *Jones*, 707 F.2d at 1172 (defendant abandoned satchel even though "he may have hoped that the police would not find it and that he could later retrieve it"). Under the circumstances presented here, Defendant's purported attempt to conceal his backpack in a bush and his apparent "hope[] . . . that he could later retrieve it," *Jones*, 707 F.2d at 1172, are wholly inadequate to confer "an objectively reasonable expectation of privacy in the [backpack] that society will recognize." *Denny*, 441 F.3d at 1227. For all of these reasons, the Court agrees with the Magistrate Judge that the Government has shown by a preponderance of the evidence that Defendant voluntarily abandoned his backpack

before Detective Nakamura seized and searched it, and her warrantless seizure and search complied with the Fourth Amendment. The Court will therefore deny Defendant's Motion to Suppress.

      **C.**    *The Court declines to address the Government's remaining arguments against suppression.*

Because the Court will deny Defendant's Motion on the basis of abandonment, the Court need not consider the Government's other arguments in opposition to the Motion, *i.e.*, that (1) officers seized and searched Defendant's backpack in good faith because they reasonably believed he had abandoned it, and (2) the backpack's contents would have inevitably been discovered in the course of Defendant's arrest. (Doc. 31 at 14-18.)

## V. <u>Conclusion</u>

For all of the above reasons, Defendant Esteban Gallardo's Motion to Suppress (Doc. 29) is DENIED.

IT IS SO ORDERED.

_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE